**ATLANTIC SUGAR, LTD., and Redpath Sugars, Ltd., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**Amstar Corporation, Party-in-Interest.**

**Court No. 80–5–00754.**

United States Court of International Trade.

July 8, 1981.

See also, C.I.T., 511 F.Supp. 819.

Rogers & Wells, Washington, D. C. (Robert V. McIntyre and George C. Smith, Washington, D. C., on the brief), for plaintiffs.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Washington, D. C. (Francis J. Sailer, Commercial Litigation Branch, Washington, D. C., on the brief), for defendant.

Baker & McKenzie, Washington, D. C. (Thomas P. Ondeck, Washington, D. C., on the brief), and Sullivan & Cromwell, New York City (James H. Carter, New York City, on the brief), for party-in-interest.

## MEMORANDUM AND ORDER

WATSON, Judge:

This is an action under Section 516A(a)(2) of the Tariff Act of 1930, (19 U.S.C. § 1516a(a)(2)). It was brought by Atlantic Sugar, Ltd. and Redpath Sugars, Ltd. for judicial review of a determination by the International Trade Commission (ITC) that the importation of refined sugar from Can-

ada (previously found to have been sold here at less than fair value during the period of October 1, 1978 through March 31, 1979) was causing material injury to an industry in the United States.[1] The result of that determination was the issuance of a final antidumping duty order. This judicial review is for the purpose of deciding whether or not the determination was supported by substantial evidence and made in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B).

The matter is now before the Court following motions by the plaintiffs and the government under rule 56.1, which is the Court's analogue for a motion for summary judgment when the review is to be based solely upon the administrative record. Amstar, the intervenor, is the domestic sugar producer whose petition initiated the investigation which resulted in the determination of material injury. It has participated in the briefing of the motion and the oral argument which ensued.

The case lends itself to discussion in two parts. In the first part are those issues which relate to the consequences of recently discovered errors connected to two of the findings made by the ITC. These were the finding that a regional industry existed and the finding that it was the producers of all, or almost all, of the production in the region who suffered material injury.

In the second part are those issues raised in claims made by plaintiffs, that various findings were not supported by substantial evidence or were otherwise not in conformity with the law.

### I

The statutory guidelines for the determination of material injury in this antidumping investigation are contained in Section 771 of the Tariff Act of 1930, as added by the Trade Agreements Act of 1979 (19 U.S.C. § 1677). The first dispute centers on the finding by the ITC that the sugar producers of an eleven-state region of the Northeast United States should be treated as a separate industry. The relevant statutory language is found at 19 U.S.C. § 1677(4)(C) and reads as follows:

> *Regional industries.* In appropriate circumstances, the United States, for a particular product market, may be divided into two or more markets and the producers within each market may be treated as if they were a separate industry if—
>
> (i) the producers within such market sell all or almost all of their production of the like product in question in that market, and
>
> (ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.

A serious question has arisen with respect to the second of these two explicitly stated conditions. In its determination, the ITC stated that "[o]nly about 5.5 percent of the sales of producers located in states outside the region were to customers within the region." It further stated that it considered this amount to be "insubstantial." During the pendency of this action, however, the ITC realized that it had not made its calculation as a percentage of the demand in the Northeast region, as required by the statute. When the 5.5 percent of "outside" sales were properly calculated as *a percentage of all sales within the N.E. region* the figure rose to 12 to 16 percent for the period under study. This meant that 12 to 16 percent of the demand in the market was being supplied by producers located elsewhere in the United States.

Plaintiffs argue that these new figures are clearly substantial as a matter of law, being three to four times the percentage of sales represented by the imports, being substantial in an ordinary arithmetical sense; going markedly beyond the bounds intended by Congress to define a truly isolated market, and beyond the range in which agency

---

1. *Sugars And Sirups From Canada*, Inv. No. 731–TA–3 (Final), USITC Pub. No. 1047 (March, 1980).

discretion could conceivably be exercised. Plaintiffs ask the Court to set aside the injury determination as unlawful or, if it should see fit to remand the matter to the agency, to do so with instructions that the conditions for finding a separate industry do not exist.

Defendant argues that the Court should limit itself to remanding the question for the ITC to reconsider its finding based on the correct percentage.

■ Although the new figures are markedly larger the Court cannot say that, as a matter of law, they are beyond the realm of what can be considered insubstantial. For this reason, the Court will remand the question, not however, without expressing some of the factors which ought to be involved in the reconsideration.

■ The level of imports in a region is not a standard for measuring the substantiality of sales in the region from elsewhere in the United States. First, there is the distinction that imports need only be "significant" while the satisfaction of demand from elsewhere in the United States must not occur to any "substantial" degree. More importantly, there is a teleological distinction. The imports, which are in a "suspect" condition because they are being sold at less than fair value, are being examined for their significance as a possible cause of injury. Causal effect in such cases, if we may draw an analogy to the law of torts, can be demonstrated at a relatively low threshold level provided the cause is in "proximity." The sales from elsewhere are being examined to determine the isolation of a market, which is a more general question of condition, not cause and effect. Therefore, the quantity of fairly priced material from elsewhere in the U.S. may exceed that of imports sold at less than fair value without necessarily being "substantial" in the sense of the statute.

However, with respect to the ordinary meaning suggested by the phrase "to any substantial degree" the Court is concerned by the degree of market penetration shown in the corrected data. The Court notes the possible inconsistency between isolation and reliance on producers elsewhere for the satisfaction of 12 to 16 percent of demand. The Court is troubled by the prospect that permitting this degree of external domestic satisfaction of a market might allow an arbitrary or freehanded sculpting of regional markets. These are questions with which the ITC must grapple in its reconsideration.

The legislature took pains to carefully define the regional variation of the term "industry." It is conceivable that this definition may be subject to special considerations which are within the capacity of the ITC to determine and explain. For this reason, in this formative stage of the administration of the new law, and at this juncture of the action the Court does not undertake to state the limits of the phrase "to any substantial degree." It also refrains from judging whether analogies may be drawn, as suggested by plaintiffs, between the substantiality of the sales from elsewhere and such concepts as the substantiality of the lessening of competition required by § 3 of the Clayton Act (15 U.S.C. § 14). Consequently, the Court does not reach such examples as the finding in *Standard Oil Co. v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) that objectionable contracts which affected 6.7 percent of the business in a seven-state area went far toward supporting the inference that competition had been, or probably would be substantially lessened.

■ A proper respect for the role of the ITC suggests that it be allowed to complete an analysis of the corrected data and bring its expertise to bear on this question. The Court notes only that when the limits of the plain meaning of the statutory language are being tested, it is particularly important for the ITC to state with precision the reasoning which supports its conclusions. See generally, *SCM Corporation v. United States*, 84 Cust.Ct. ——, C.R.D. 80–2, 487 F.Supp. 96 (1980).

■ The same approach holds true for the second error discovered during the pendency of this proceeding. The second error bears on a subsequent step in the

ITC's determination. When the existence of a separate regional industry has been determined, the law provides that material injury may be found if there is a concentration of dumped imports in that market and if the producers *of all, or almost all, of the production within that market* are being materially injured. These additional factors are set out in the continuation of 19 U.S.C. § 1677(4)(C) which reads as follows:

In such appropriate circumstances, material injury . . . may be found to exist with respect to an industry . . . if there is a concentration of . . . dumped imports into such an isolated market and if the producers of all, or almost all, of the production within that market are being materially injured . . . by reason of the . . . dumped imports.

Later, in 19 U.S.C. § 1677(7)(C)(iii) the statute mentions actual decline in profits as one of the factors which the ITC must evaluate in examining the impact of imports and arriving at a conclusion regarding material injury.

The ITC found declining profits in general and net losses for several firms. It now appears that the financial data of the second largest producer in the region was mistakenly treated by the ITC as showing a loss. In reality, the data showed that the producer operated profitably during the period under consideration. This certainly requires a reevaluation of the evidence. A complicating factor is the existence of a special agreement between this producer and its supplier which adjusts the raw material supply price to insure a profit for the producer.

Thus, the question is presented of the significance of the profitability of such a producer and what effect it has on the requirement that, for a regional industry, the material injury must be to the producers of all or almost all the production in the market. The finding by the ITC on this point must now be reconsidered in light of the complete evidence. Once again the magnitude of the error and the existence of an explicit statutory guideline require that the results of this reconsideration be expressed with particularity, and that the reasoning be given which indicates how the statutory standard has been applied.

II

The Court sees no lack of substantial evidence or lack of conformity to the law in the other findings to which plaintiffs object. A discussion of these objections forms the second part of this opinion.

■ It is true that the ITC in some recent investigations has expressed the view that the "appropriate circumstances" for finding a regional industry require that the condition of the regional producers be worse than that of the industry at large.[2] However, the possibility that distinct reasons can account for differences between the economic health of a regional industry and the industry elsewhere, make this an unreliable standard, even assuming it is a permissible factor in determining the existence of a regional industry. The Court cannot find error in the failure to apply a standard it considers superfluous and of questionable logical validity.

■ The previously mentioned statutory requirement that producers in a regional industry sell all or almost all their production in that market is satisfied by the sale of 94 percent of production (using the lower of the two figures found by the Commission). The requirement that there be a "concentration" of dumped imports in the region is certainly supported by the sale of approximately 97 percent of the imports in the region under consideration.

■ Plaintiffs claim that the Commission's analysis of the volume of the imports was cursory and flawed. The Commission is required by 19 U.S.C. § 1677(7)(C)(i) to consider whether the volume of imports (or

**2.** *Certain Steel Wire Nails from the Republic of Korea,* Inv. No. 731–TA–26 (Final) under the Tariff Act (1930), USITC Pub. No. 1088 (Aug. 1980).

*Asphalt Roofing Shingles from Canada,* Inv. No. 731–TA–29 (Preliminary), USITC Pub. No. 1100, 2 ITRD 5171 (Oct.1980).

the increase in volume) is "significant," either in absolute terms or relative to production or consumption in the United States. In this case the maximum volume of imports in the region (which is the proper focus of attention in this case) was 4.5 percent of the primary distribution, which is a volume measure of refiners' sales and a reasonable reflection of consumption. The Court sees no deficiency in reasoning which regards small percentages as significant, particularly when the legislative history shows an awareness of this very possibility. See, S.Rep.No.96–249, 96th Cong., 1st Sess., p. 88 (1979), U.S. Code Cong. & Admin. News, 381.

■ Evidence that regional producers had to sell at a substantial discount to meet import competition was sufficient to support a finding that prices were depressed to a significant degree within the meaning of 19 U.S.C. § 1677(7)(C)(ii)(II).

■ For agricultural products, the ITC is also required to consider any increased burden on government price support programs. 19 U.S.C. § 1677(7)(D)(ii). Here, the ITC overstated the impact of the imports on the government's sugar price support program when it called the effect "particularly severe." [3] However, even though substantial evidence may been lacking, the conclusion itself was immaterial. A lesser burden, or even the absence of any burden at all, on the sugar price support program would not necessarily detract from an injury determination which was based on the impact of the imports on the producers themselves. The statutory requirement that the ITC consider any increased burden on government price support programs is intended to insure that the injury analysis of an agricultural industry will not be distorted by the beneficial effects of those programs and will not be avoided by the superficial appearance of an industry whose health is being sustained by government assistance. See, S.Rep.No.96–249, 96th Cong., 1st Sess., p. 88 (1979). Here, where the industry was found to be suffering and displaying injury directly, the burden on government price support programs was of doubtful importance.

■ In this connection, it should also be noted that no single factor is given decisive effect in determining material injury. In fact, at 19 U.S.C. § 1677(7)(E)(ii) the law specifically disclaims the controlling effect of the presence or absence of any of the evaluative factors.

■ Plaintiffs also argue that the ITC failed to make findings with respect to their claim that the declining per capita consumption of sugar and the increased use of high-fructose corn syrup were more significant causes of injury to the industry than the importations. This does not detract from the ITC's determination. The ITC is not required to weigh the extent of injury from imports against the extent of injury from other causes, if they exist. The essence of its duty is to discern whether or not the imports are a cause of material injury to the industry and to do so based on a reasoned analysis of the evidence before it. See, S.Rep.No.96–249, 96th Cong., 1st Sess., pp. 74–75 (1979). If substantial evidence exists to support the finding of sufficient causal connection between the imports and the injury, the existence of other contributing causes is immaterial.

■ The ITC's conclusion that regional producers lost sales as a result of the imports was supported by substantial evidence, both in the form of responses to questionnaires by regional producers and information from the Departments of Labor and Commerce. The information from the other government agencies was derived from their determinations that sugar workers at certain locations in the region were eligible for adjustment assistance, determinations which are based in part on findings that declining sales due to imports contributed to the workers' predicament. 19 U.S.C. § 2272.

Plaintiffs' claim that they were denied due process by reason of the irregular attendance of the Commissioners during plaintiffs' presentation was unsupported and of doubtful legal significance.

Defendant has asked for a partial affirmance of the final injury determination.

---

3. *Sugars And Sirups From Canada, supra*, at 4.

However, despite the existence of subsidiary findings with which the Court has not found fault, the final injury determination must be considered as a unitary decision. In its present form, it is defective and cannot be approved.

It is therefore ORDERED that the final antidumping duty order and the injury determination upon which it was based are vacated, and it is further

ORDERED that within 90 days the ITC shall issue a new determination after considering the corrected data regarding the regional demand supplied from elsewhere and, if it is reached, the evidence regarding the profitability of the producers in the region, and it is further

ORDERED that the new determination shall state with particularity the standards applied and the reasoning utilized in arriving at a conclusion as to whether or not the demand in the region is satisfied to any substantial degree from elsewhere in the United States and, if it is reached, shall give a similar explanation for the conclusion as to whether it is the producers of all, or almost all, of the production in that market who are being materially injured, and it is further

ORDERED that this action is stayed until the issuance of a new determination.